Simon **MITZEL**, Plaintiff and Respondent,

v.

Kasper **SCHATZ**, Defendant and Appellant.

No. 8587.

Supreme Court of North Dakota.

March 21, 1970.

Nilles, Oehlert, Hansen, Selbo & Magill, Fargo, for appellant.

Vogel, Bair & Graff, Mandan, for respondent, and Robert Chesrown, Linton.

ERICKSTAD, Judge.

This is the second time this case has been before this court. On the first occasion, procedural questions were determined by decision rendered December 10, 1968, 167 N.W.2d 519.

By summons and complaint dated February 22, 1967, Simon Mitzel initiated an action against Kasper Schatz in which he sought to recover for personal injuries allegedly suffered in an intersectional accident which occurred on November 15, 1965, on a county road 1½ miles east of Zeeland in McIntosh County.

The complaint asserted that Mr. Mitzel's injuries were the result of the negligent operation of a motor vehicle by Mr. Schatz.

Mr. Schatz responded by answer dated March 17, 1967, and amended answer dated November 15, 1967. He admitted that a two-car accident occurred on the date and at the place alleged in the complaint but specifically denied that he was in any way negligent in the operation of his automobile. He further alleged that the accident was caused wholly by the negligence of Simon Mitzel and his son Richard. For a separate defense he alleged that on November 18, 1965, for valuable consideration Simon Mitzel released him and others from "any and all known and unknown actions, causes of action, claims, demands, damages, costs, loss of services, expenses, compensation, rights of contribution and all consequent damages on account or in any way growing out of any and all known and unknown personal injuries and property damage and death resulting or to result from an accident that occurred on or about the 15th day of November, 1965, near Zeeland, North Dakota;" and that by virtue of said release, Simon Mitzel no longer had a cause of action against him.

Mr. Mitzel anticipated this defense by including in his complaint an allegation that the release given was in settlement only of the property damage to his automobile. He further asserted: "That if the defendant alleges, or if it is hereafter established, that any part of said settlement was for personal injuries received in said accident, the plaintiff hereby rescinds said settlement upon the ground that said release was given by mistake in that the plaintiff was not aware that he had suffered any serious personal injury in said accident and was specifically not aware that he had suffered brain damage as a result of said accident, and further that said release was obtained by fraud, and the plaintiff hereby offers to restore any and all things of value received from defendant as fully and completely as if said release had never been given."

Following a hearing on a motion to sever the issue of whether the release given precluded Simon Mitzel from recovering from Mr. Schatz for his personal injuries, the court granted said motion and set that issue down for separate trial to the court without a jury. Following that trial the court concluded that the release which was executed by Mr. Mitzel on November 18, 1965, was executed under a mistake of fact in respect to the personal injuries that Mr. Mitzel had sustained as a result of the automobile accident. It held that Mr. Mitzel was entitled to have judgment rescinding the release in respect to the settlement of the personal injury claim and that the release was not a bar to the instant action for damages for personal injuries. Pursuant to the findings of fact, conclusions of law, and order for judgment dated March 5, 1968, judgment dated March 13, 1968, was entered.

By notice dated April 17, 1968, Mr. Schatz appealed. Following the service of this notice upon him, Mr. Mitzel made a motion in this court for a dismissal of the appeal on the following grounds:

(1) The judgment of the district court is interlocutory in nature and does not adjudicate all of the rights and claims of the parties in the pending action; and

(2) The judgment does not comply with the provisions of N.D.R.Civ.P. 54(b).

Following service of this motion upon him, Mr. Schatz moved the court ex parte, citing N.D.R.Civ.P. 60, for an order nunc pro tunc correcting the conclusions of law, order for judgment, and judgment dated March 13, 1968, to provide, pursuant to N.D.R.Civ.P. 54(b), that there was no just reason for delay and to expressly direct the entry of judgment. The court granted this motion, and in its order of September 28, 1968, expressly determined that there was no just reason for delay and directed the entry of judgment to be effective as of the date of the original judgment. A document entitled "Judgment on Separate Trial" identical to the original judgment was thereafter executed on September 30, 1968, by the Clerk of the District Court of McIntosh County.

We held the first Mitzel appeal was premature, it having been taken before the determination and direction required by Rule 54(b) were made.

The instant appeal arises out of a notice of appeal dated March 31, 1969, from the amended judgment of the district court dated September 30, 1968. A trial de novo is demanded in this court.

In this appeal Mr. Schatz has asserted numerous specifications of error, which we shall consider in the order in which he has stated them in his brief.

Specification of error No. 1: "The trial court erred in refusing to allow the defendant to go into the issue of liability and to prove settlement based on a dis-puted, extremely doubtful claim because the facts without dispute tended to show a collision between two vehicles coming at right angles together in the center of a wide-open, unobstructed intersection with the plaintiff's driver's negligence imputable to the plaintiff so that plaintiff was chargeable with contributory negligence as a matter of law."

Mr. Schatz asserts that the *locus in quo* was a level, wide-open, unobstructed rural intersection with each vehicle converging upon the other at a right angle, that there were no distracting circumstances or weather or atmospheric conditions contributing to the collision, and that under such circumstances both drivers were negligent as a matter of law. In support thereof he cites Knudsen v. Arendt, 79 N.D. 316, 56 N.W.2d 340 (1952); Johnson v. Sebens, 86 N.W.2d 386, 391 (N.D.1957); and Thompson v. Nettum, 163 N.W.2d 91 (N.D.1968). He further asserts that the evidence which the trial court refused to consider would have imputed to Mr. Mitzel his son's negligence as the driver. To support this contention, Mr. Schatz merely refers us to parts of the transcript, including that part containing the offer of proof. He refers us to no statutes or decisions in support of his position that, under the facts as asserted in the offer of proof and otherwise, the negligence of the son must be imputed to the father.

The decisions cited in contending negligence of both drivers are distinguishable from this case on facts. In *Knudsen,* the litigation arose out of a collision between a car driven by the plaintiff's decedent and one driven by the defendant, both drivers being alone in their cars at the time of the collision. The plaintiff's decedent died as the result of injuries he suffered in the collision, and the defendant testified that as a result of the injuries he suffered from the collision he had no recollection of the collision or of the events immediately preceding it. There were no other witnesses to the collision. In *Johnson,* the supreme court held that

the trial court committed error in granting the defendant's motion for a directed verdict, but found the error to be without prejudice for the reason that there was no material conflict in the testimony of the parties. In *Thompson*, both drivers involved in an intersectional collision suffered from retrograde amnesia and there were no other eyewitnesses to the collision.

■ After analyzing the transcript references, including that part relating to the offer of proof, we are of the opinion that the trial court was correct in declining to decide the issue of liability at that time, since, as a result of the defendant's own motion, the issue of liability had been severed from the issue of the effect of the release.

Pertinent to this is Rule 50(a) of North Dakota Rules of Civil Procedure, which reads:

> When made—Effect. At the close of all of the evidence any party may move the court to direct a verdict in his favor upon one or more claims and against one or more parties. If the adverse party objects thereto, the court shall submit to the jury the issues of all claims as to which evidence has been received * * * and as to such claims the motion shall be denied. A motion for a directed verdict is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor, and if the insufficiency of the evidence is specified the motion shall point out the particulars wherein the evidence is insufficient.

■ Our view is supported by the general rule which we have stated countless times: questions of negligence, proximate cause, contributory negligence, and assumption of risk are ordinarily questions of fact for the jury. It is only when the evidence is such that reasonable men can draw but one conclusion therefrom that they become questions of law for the court.

In 1967 we applied that general rule to an intersectional collision where the drivers were able to see 300 to 350 feet in the pertinent directions. In *Gleson,* the plaintiff's decedent driver was killed instantly leaving no witness to the collision other than the defendant driver of the other vehicle. Gleson v. Thompson, 154 N.W.2d 780, 786, 787 (N.D.1967).

As the issue of liability was not litigated, Mr. Mitzel did not offer evidence to support his position, but we note from what evidence was submitted that Mr. Schatz's vehicle entered the intersection to the left of the plaintiff's vehicle and that at the time of the collision two dogs were riding in the cab of Mr. Schatz's pickup. It is conceivable that the dogs may have obstructed Mr. Schatz's view to his right. In this case, the three witnesses are still alive and none is suffering from amnesia. Accordingly, the liability, if any, should be determined by a jury.

Although for reasons previously stated we find no error in the trial court's refusal to determine liability at the separate trial of the issue of the legality of the release, we further emphasis that Mr. Schatz did not in his brief or during oral argument make clear the legal theory by which the negligence of the driver-son is imputed to the father-passenger-owner.

■ If the contended liability is on the theory of the existence of a joint enterprise between the son and the father, it is significant that whether they were engaged in a joint enterprise is normally a question for the jury. Prosser Torts 3rd Ed. HB, Section 71 Joint Enterprise, p. 488.

Without deciding whether a joint enterprise exists in this case we think what Professor Prosser has to say on this subject is timely.

> If the question were now to be raised for the first time, arguments might be

advanced against the vicarious responsibility, whether as plaintiff or as defendant, of the passenger who is engaged in a "joint enterprise" for the negligence of his driver. The contractual agreement by which he is said to enter into such an arrangement is all too obviously a fiction in situations where the parties have merely got together for the ride; and upon this there is erected a second fiction, that the passenger shares a "right of control" of the operation of the vehicle; and on this is erected in turn a third fiction, that the driver is his agent or servant. This topheavy structure tends to fall of its own weight. *In the usual case the passenger has no physical ability to control the operation of the car, and no opportunity to interfere with it; and any attempt on his part to do so in fact would be a dangerously distracting piece of backseat driving which might very well amount to negligence in itself.* [Emphasis added.]

Prosser Torts 3rd Ed. HB, Section 71 Joint Enterprise, p. 494.

Other bases for imputing the negligence of one party to another are stated in Restatement of the Law 2d, Torts, Sections 485 and 486, but for reasons heretofore explained we find it unnecessary to determine that issue at this time.

It should be noted that the family purpose doctrine has no application to this case. See Michaelsohn v. Smith, 113 N.W. 2d 571 (N.D.1962).

Both sides of this controversy rely for the most part on old decisions of courts of other states. Having read the various authorities cited us by both parties and without discussing all the citations in detail herein, we conclude that the reasoning employed in a 1928 decision of the supreme court of New Hampshire is the most convincing.

In that case, as in this case, the defendant argued that it had bought its peace and that therefore it was immaterial that there may have been a mutual mistake of fact. We quote a part of the court's decision:

It is claimed that the purchase of peace is a necessary inference from the adjuster's testimony that liability was denied when the settlement was made. It does not appear, however, that the court adopted the testimony, or at best considered the denial, it made as more than an argument in an effort to make the best settlement possible. More broadly, purchase of peace in the sense of its distinction from payment of damages means a settlement whether or not the parties are mistaken as to liability and as to the nature and extent of the injury. In one sense there is a purchase of peace in every settlement, but, as expressing a test of the binding force of a release in spite of mutual mistake, it means that the parties in making the release agree in effect that it shall not be set aside for such a mistake. In general definition it negatives an understanding that the issues of liability and results of the injury are of the essence of making the release. In Cogswell v. Railroad, supra, [78 N.H. 379, 101 A. 145], it was expressly found that both parties understood that the release was "intended to settle once and for all every claim which Emery (the person injured) had or might have in the future growing out of this accident," and it followed that "the extent of Emery's injury did not affect the subject-matter of the contract" to avoid litigation rather than to give compensation for damages. Compensation being given, litigation is avoided as an incidental result. But, *even if the result is sought, yet if it is sought to be accomplished by means of compensation, then a material mistake in the measurement of compensation gives the right to have the release canceled, on the theory of cancellation for mutual mistake applicable to contracts generally.* McIsaac v. McMurray, 77 N.H. 466, 93 A. 115, L.R.A.1916B, 769. The evidence here fully justifies the finding that the parties settled on the basis of

giving compensation rather than of avoiding litigation as their underlying purpose. [Emphasis added.]

Poti v. New England Road Machinery Co., 83 N.H. 232, 140 A. 587, 588 (1928).

In the instant case, the estimate of the cost of the repair of Mr. Mitzel's automobile obtained by Mr. Peter Mueller, the adjuster for Mr. Schatz's insurance company, came to $1,584.64. The high book value of Mr. Mitzel's 1963 Chevrolet was a little over $1,700. It was brought out on cross-examination of Mr. Mueller that Mr. Mitzel had informed him that as of the date of the settlement, which was the third day following the collision, Mr. Mitzel's doctor bills were a little over $40. On the face of the check given Mr. Mitzel by Mr. Schatz's insurance company in settlement, Mr. Mueller apportioned the $1,900 as follows: BI $100, PD $1,800. It was brought out at the trial that BI refers to bodily injury and that PD refers to property damage. Mr. Mueller explained away those notations, however, as being merely bookkeeping entries for the benefit of the home office, inasmuch as the salvage of the automobile brought a return to the insurance company of $500. Although Mr. Mueller had not received any medical report from Mr. Mitzel's doctor, he had Mr. Mitzel's statement that the X rays showed no broken bones. He personally observed the black eye. From all of these facts, we think it is quite clear that the settlement made in this case was a settlement based upon compensation rather than upon merely avoiding litigation.

Relative to the contention made by Mr. Schatz that the language of the release indicates that what the parties intended was the elimination of any possible litigation, we think what was said in a 1936 decision of the Court of Chancery of New Jersey is pertinent.

It will be noted that the release in question is, in its terminology, sufficient to indicate that what the parties sought to accomplish by its execution was to end, once and for all, any contention between the parties as to compensation for injuries and possible litigation. It was a compromise of all the claims of complainant against the defendant growing out of the accident, including the question of liability as well as that of compensation for injuries, but it was nevertheless a contract of compromise and in the event of a mutual mistake having been made by the parties as to a past or present fact which was material to the contract, equity should grant and not refuse relief by reason of mere terminology of the contract, unless it clearly appears from the compromise contract that the consideration was paid by defendant to complainant and received by her simply to avoid further controversy, and not as a compromise of complainant's injury, in which event any mistake as to extent of injuries would be immaterial.

Spangler v. Kartzmark, 121 N.J.E. 64, 187 A. 770, 771 (1936).

Describing the release in *Spangler*, the New Jersey court said:

The release on its face recites in bold type at the top thereof "Release in Full of all Claims" and, in a raised letter black box at the left of her signature, "This is a Release in Full." The language of the release is: "Forever discharge Roy M. Kartzmark from any and all claims and demands, which I now have or may hereafter have by reason of all injuries and other damages sustained by me." The release denied liability.

Spangler v. Kartzmark, 121 N.J.E. 64, 187 A. 770 (1936).

It appears quite clear that although Mr. Mitzel suffered almost continuously from a headache following his accident to the time of his surgery some eight weeks later (all the while continuing to drive an automobile and keeping his social commitments), he thought he was merely suffering from a big black eye and so did

his local doctor and other doctors, as well as the insurance adjuster, until he was referred to a Bismarck doctor who referred him to a specialist in Fargo who performed surgery to correct a condition caused by a subdural hematoma. In light of these facts, it is obvious that the release was signed under a mutual mistake of fact as to the nature and extent of injuries from which Mr. Mitzel suffered.

In sustaining the trial court in setting aside a release upon the ground of mutual mistake of fact, the New Hampshire court in *Poti* said:

If the difference may not be called one of kind, there was a difference of extent of injury between what was understood and what in fact existed. The fact that the bruise was severe rather than mild did not depend upon future contingencies, but what had already occurred made it severe. The controlling mistake was of opinion as to what had happened, and the opinion as to future developments was a mistaken one only because of the mistake as to the existing facts. Instead of mistaken conclusions being drawn from correct premises, proper conclusions were drawn from incorrect premises. The mistake contained in the conclusions was only the adopted mistake in the premises. The situation thus appears to be no different than one of mistake as to the kind or nature of the injury. It was by reason of a controlling mistake as to the existing facts that the parties are found to have acted, and, as the evidence supports the findings, the exception is overruled.

Poti v. New England Road Machinery Co., 83 N.H. 232, 140 A. 587, 590 (1928).

▉ In light of what we have said herein we conclude that the trial court was correct in its holding as to this issue and move on to specification of error No. 2, which Mr. Schatz has designated as follows:

"The court erred in accepting plaintiff's partial tender."

In support of this position, Mr. Schatz argues that by tendering only $100 of the total consideration received for the release and doing so after six months from the time of the injury, Mr. Mitzel did not comply with section 9-08-09 of the North Dakota Century Code, which he asserts is controlling in this case.

Section 9-08-09 N.D.C.C. reads as follows:

9-08-09. Rescission of contract for damages for personal injuries.—Any person sustaining personal injuries, or in case of his death, his personal representative, may elect at any time within six months after the date of such injury to avoid any settlement, adjustment, or contract made in connection therewith within the time mentioned in section 9-08-08, by a notice in writing to that effect. The bringing of an action to recover damages for such injuries shall avoid any such settlement or adjustment. Whenever an action shall be commenced within the period of time herein limited to recover such damages, the amount received by the injured person, or his representative, in case of his decease, in any such settlement or adjustment shall not be a bar to the prosecution of the action but may be set up as an offset or counterclaim to the amount of damages recoverable, if any, or applied toward payment of any judgment recovered in any such action if such amount so received by the injured person or his representative has not been pleaded specifically as an offset or counterclaim.

It is his position that section 9-08-09 indicates that while the consideration received need not be returned if the release is rescinded within six months of the injury (the time specified in section 9-08-08 N.D.C.C.), such consideration must be returned if the action is brought after that time. In the instant case, Mr. Mitzel took

no action to rescind the release until 15 months following the date of the injury. It is therefore Mr. Schatz's position that if rescission is to be allowed at all, Mr. Mitzel should have tendered the full consideration as a condition precedent to maintaining his suit. He refers us to the general law of rescission, as follows:

9–09–04. Rules governing rescission.—Rescission, when not effected by consent or pursuant to sections 9–08–08 and 9–08–09, can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence to comply with the following rules:

1. He must rescind promptly upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability and is aware of his right to rescind; and

2. He must restore to the other party everything of value which he has received from him under the contract or must offer to restore the same upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so.

North Dakota Century Code.

The trial court was of the opinion that the release was divisible and could be rescinded in part and affirmed in part.

Mr. Schatz cites 76 C.J.S. Release § 37, as requiring a full restoration of the consideration.

* * * the weight of authority is to the effect that, subject to some qualifications and exceptions, a person who executes a release and afterwards seeks to avoid its effect on any ground which will entitle him to avoid it, must ordinarily first restore the status quo by restoring, tendering, or offering to restore what he has received in return for the release, at least where it appears that it is of value; he must place the parties in their former position, or as near such position as the circumstances of the case will permit, * * *

He further refers us to a 1918 decision of this court, the pertinent part of which he asserts as follows:

One who has been led into a contract upon which he has received something of value cannot ignore the contract, however induced, and proceed in a court of law as if the relations of the parties were wholly unaffected thereby. He cannot, while retaining its benefits, and thus affirming the contract, treat it as though it did not exist. "He cannot treat it as good in part and void in part, but must affirm or void it as a whole." Home Ins. Co. v. Howard, 111 Ind. 544, 13 N.E. 103, 104.

Swan v. Great Northern Ry. Co., 40 N.D. 258, 168 N.W. 657, 658, L.R.A. 1918F, 1063 (1918).

We think it is important to note, however, that in *Swan,* the case relied on by Mr. Schatz, the court cited exceptions to the general rule that in seeking to rescind one must restore the other party to his original position.

The pertinent part of that reference follows:

Thus, it has been held that the consideration need not be returned in order to effect a rescission and entitle the defrauded party to maintain an action upon the original claim: (1) Where a tender would have been useless, or where the thing is utterly worthless; (2) where there may be a severance of one part of the contract, in which event a partial rescission is sometimes allowed in the interests of justice; * * *.

Swan v. Great Northern Ry. Co., 40 N.D. 258, 168 N.W. 657, 660, L.R.A.1918 F, 1063 (1918).

In American Jurisprudence we note the following:

It is the general rule that an entire or indivisible contract cannot be rescinded

in part; the right to rescind must be exercised in toto, and the contract must stand in all its provisions or fall altogether. In other words, a right to rescind pertains to the whole of such a contract and cannot be exercised as to a part only. A party cannot, as a rule, rescind or repudiate the unfavorable parts of a contract and claim the benefit of the residue.

*On the other hand, a partial rescission may be allowed where the contract is a divisible one and the ground of rescission relates merely to a severable part thereof.* Moreover, even aside from rights of partial rescission in cases of actual severability, instances occur in which partial rescission is allowed. The cases in which this has been allowed do not lend themselves to satisfactory abstract statement and rest largely upon their peculiar facts. It may, however, be said that a right of partial rescission may sometimes be upheld simply because under the peculiar circumstances it is essential to a just result. [Emphasis added.]

17 Am.Jur.2d, Contracts § 488 (1964).

In the instant case, we are of the opinion that the claim for property damage is severable from the claim for personal injury and we do this despite the fact that Mr. Mueller, the adjuster for the insurance company, testified that it was the policy of the insurance company never to settle a property damage claim without simultaneously settling the bodily injury claim. Although such a policy may be recommended for its expediency, we do not think it is one that should be encouraged by the courts.

The third specification of error is that the trial court erred in denying the defendant's motion to dismiss on grounds of the statute of limitations. In support of this contention Mr. Schatz cites sections 9-08-08 and 9-08-09 of the North Dakota Century Code.

9-08-08. Settlement of damages for personal injuries voidable.—Every settlement or adjustment of any cause of action for damages on account of any personal injuries received, whether death ensues or not to the person injured, and every contract of retainer or employment to prosecute such an action, shall be voidable if made within thirty days after such injury or if made while the person so injured is under disability from the effect of the injury so received and within six months after the date of the injury.

North Dakota Century Code.

The provisions of 9-08-09 N.D.C.C. are set forth earlier in this opinion.

It is Mr. Schatz's contention that by those statutes a contract of settlement is voidable for a period of six months, but after that time the contract is to be regarded as final and no longer voidable. He urges that the intent of the Legislature is clearly shown by the wording of section 9-08-09 to the effect that: "Whenever an action shall be commenced within the period of time herein limited [six months following the date of the injury] to recover such damages, the amount received by the injured person, * * * in any such settlement * * * shall not be a bar to the prosecution of the action * * *" He asserts that by implication the statute provides that if the action is not brought within six months, the amount received by the releasor in the settlement is a bar to the action. In other words, he contends that the Legislature has provided a statute of limitations within the statute creating the right of action to avoid contracts of settlement.

In support of his position, he refers us to a 1938 Texas decision in which the Commission of Appeals Court quoted from Bement v. Grand Rapids and I. Ry. Co., 194 Mich. 64, 160 N.W. 424, 425, L.R.A.1917E, 322 (1916) as follows:

"A positive distinction seems to be made between cases in which the limitation of time for bringing suit is contained in the statute which creates the liability and right of action and general statutes of limitations of the rights of action existing

under other statutes or under the common law. In the former the limitation of time is a limitation of the right, and, as has been said, the suit cannot be maintained if not brought within the time limited. * * *"

Wichita Falls & S. R. Co. v. Durham, 132 Tex. 143, 120 S.W.2d 803, 804 (1938).

Mr. Mitzel contends, however, that the contract of settlement is governed by section 28–01–16 of the North Dakota Century Code, which provides for a six-year limitation.

The pertinent parts of that section follow:

28–01–16. Actions having six years limitations.—The following actions must be commenced within six years after the cause of action has accrued:

1. An action upon a contract, obligation, or liability, express or implied, subject to the provisions of sections 28–01–15 and 41–02–104;

  *  *  *  *  *  *

6. An action for relief on the ground of fraud in all cases both at law and in equity, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud; * * *.

North Dakota Century Code.

Further in support of his position, Mr. Schatz refers us to the following taken from a 1932 decision of our court:

It will be noted that the statute does not purport to prevent the parties from making a settlement of a claim for personal injuries. Such settlement may be made immediately after the injuries have been sustained; but the settlement is voidable at the option of the injured party for a certain period of time. However, at the expiration of the time prescribed the settlement becomes final.

Peterson v. Panovitz, 62 N.D. 328, 243 N.W. 798, 800, 801 (1932).

An analysis of *Peterson* indicates that the quotation as it relates to the effect of a release subsequent to the six months' period is purely dictum, as the facts disclose that the case involves a release which was obtained from the plaintiff by the defendant within thirty days after a collision between the plaintiff's truck and an automobile driven by the defendant and that the plaintiff elected within six months of the collision, out of which his injuries arose, to avoid the release. We think that another part of that opinion, however, is very pertinent, and that is the part which discusses the legislative purpose in enacting the statute which was the forerunner of the statutes now under consideration.

Incidentally, it is Mr. Schatz's contention that the intent of the Legislature was that a six months' period was adequate to determine whether a contract of settlement was improvidently made and that if action weren't taken within that period of time, the contract is final.

Judge Christianson, in explaining the legislative intent of the Act and speaking for the entire court in *Peterson,* said:

The object the North Dakota Legislature had in mind in enacting the statute under consideration here is quite obvious. It sought to deal with and exercise some control over the undesirable practice commonly known as "ambulance chasing." North Dakota is not the only state that has found it necessary or desirable to look for some means of control over this practice. Journal of American Judicature Society, August 1928, pp. 36–40; Kelley v. Boyne, 239 Mich. 204, 214 N.W. 316, 53 A.L.R. 273.

There are two sides to the problem of ambulance chasing: on one side is the unprofessional attorney who solicits a retainer or contract of employment to handle the claim, in personal injury cases, generally on a contingent fee basis (Kel-

ley v. Boyne, supra; In re Newell, 174 App.Div. 94, 160 N.Y.S. 275); on the other side are certain unscrupulous runners or adjusters who seek to obtain adjustments of any possible claim for damage in cases where personal injuries have been sustained in circumstances creating a basis for a claim against their employers (Gilmore v. Western Elec. Co., 42 N.D. 206, 211, 172 N.W. 111, 113). Experience has demonstrated that the two accompany and aggravate each other, each furnishing in part the reason advanced as a justification for the other. In both cases the interests of the injured party are given little or no consideration; and the agreements obtained by one class are frequently or generally as unconscionable as those obtained by the other. The record in cases which have been presented to this court bear eloquent testimony that the activities of both have resulted not only in damage to parties who have sustained personal injuries in an accident, but have resulted as well in loss and injury to the public through ill-advised, vexatious, and needless litigation. Generally the unfortunate results could and would have been avoided if some reasonable time had elapsed after the accident before binding settlements or adjustments had been made.

Peterson v. Panovitz, 62 N.D. 328, 243 N.W. 798, 800 (1932).

It is obvious from what we have herein quoted from Judge Christianson that the entire court of the State as early as 1932 considered the predecessor of our present sections 9–08–08 and 9–08–09 N.D.C.C. as an additional remedy rather than an exclusive remedy. This is consistent with the view expressed not long ago in Adams v. Little Missouri Minerals Association, 143 N.W.2d 659 (N.D.1966).

In *Little Missouri Minerals* there was a similar attempt on the part of the defendant corporation to construe a provision of the Securities Act so as to make inapplicable subsections 1 and 6 of section 28–01–16 N.D.C.C. It was asserted that any action brought on either fraud or contract or both was limited to the three- and one-year period provided for under subsection 1 of 10–04–17 N.D.C.C. Notwithstanding that contention, this court found, in effect, that subsection 1 of 10–04–17 N.D.C.C. was an additional remedy.

In arriving at that conclusion, we said:

Generally, if there is a question which statute of limitations applies, the longer term applies.

* * * [W]here substantial doubt exists as to which of two limitation statutes is applicable, the longer period will be applied.

Adams v. Little Missouri Minerals Association, 143 N.W.2d 659, 671 (N.D. 1966).

The fourth specification of error is that the trial court erred in ruling as inadmissible testimony that the parties had a right to enter into a contract of release, settlement and compromise with respect to unknown injuries, and that the court further erred in this regard in confining the evidence to a mutual mistake of fact.

Section 9–13–02 of the North Dakota Century Code reads:

9–13–02. Extension to known claims.— A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor.

Mr. Schatz asserts that the trial court, perhaps on the basis of the foregoing statute, was of the opinion that a release could not be executed to cover both known and unknown claims. He further asserts that this error was apparently realized at the conclusion of the trial, since in its memorandum opinion at page 14 the court stated:

It is a recognized principle of law that one may settle for all known and un-

known injuries if it can be established that such was the contemplation of the parties at the time of settlement.

Mr. Schatz contends that the court recognized its error too late and that the damage to him had already been done, in that he no longer had the opportunity to introduce evidence to the effect that it was within the contemplation of the parties to settle for all injuries, known and unknown.

In response to this contention, Mr. Mitzel asserts that Mr. Schatz is in error when he states that the court refused to hear evidence on the point that the release was executed to cover known and unknown claims. He asserts that as stated in the memorandum opinion both Mr. Mitzel and Mr. Mueller, the insurance adjuster, testified at length as to what occurred at the time of the execution of the release and that there is no evidence to support the contention that the parties discussed or intended a settlement for both known and unknown injuries.

We have reviewed the entire transcript and find the assertion by Mr. Mueller, the adjuster, that it was his understanding that the release covered both personal injury and property damage, but we find no testimony on his part or on anyone else's part that the release was intended to cover unknown injuries. Mr. Mueller did state on cross-examination that the only injury he knew of at the time of this settlement was the big black eye.

Mr. Mitzel asserts that the facts in this case justify rescission as a classic case of mutual mistake of fact as to the nature and extent of injuries. He summarizes the pertinent facts as follows:

* * * The settlement was made only three days after the accident. The plaintiff had seen a doctor on the day of the accident and was only aware that he had a black eye and bruises. The insurance adjuster who negotiated the settlement testified that as far as he knew the plaintiff only had "a big black eye". The

settlement negotiations were amiable and there was no argument with regard to the liability, or to the amount of the bodily injury settlement in the amount of $100.-00. Approximately a month and a half after the accident, the plaintiff's true injury was diagnosed as a subdural hematoma which is a blood clot on the brain, which required immediate surgical removal. The neurosurgeon testified to a reasonable medical certainty that the subdural hematoma was caused by the accident. Although the settlement was only for $100.00, the medical expenses alone eventually totaled $1635.82, and the plaintiff has incurred residual disability.

In arguing this specification of error, Mr. Schatz placed especial emphasis on the fact that the language of the release itself covers unknown as well as known injuries. The leading case which he cites in support of his position is that of Smith v. Loos, 78 N.M. 339, 431 P.2d 72 (1967), certiorari denied August 25, 1967. Both the release and the injuries in that case are remarkably similar to the release and injuries in the instant case. In refusing to set aside the release as a mutual mistake, the New Mexico court said:

We are of the opinion that the language of the release here involved, together with the testimony of the plaintiff himself, that he read and understood the release to mean just what was stated therein, can lead only to the conclusion that the parties understood and intended that they were effecting settlement for all claims of the plaintiff arising out of the accident, including all claims on account of personal injury, both known and unknown. The fact that the plaintiff and the adjuster were both unaware of the developing hematoma, and the fact that they would not have settled for $150.00 had they known the same, cannot be said to change the clear meaning of the language of the release, or the clear understanding and intent of plaintiff at the time he settled and executed the release. It takes little reflection on the part of

most of us to recall instances wherein our acts, entered into and consummated in accordance with our clear purpose and without any equivocation of our intent at the time, when viewed in the light of subsequent developments, appear to have been mistakes. However, the law does not and cannot operate in retrospect to relieve a party from his contractual obligations, deliberately and intentionally assumed, because of the subsequent development of unfortunate and unforeseen results.

Smith v. Loos, 78 N.M. 339, 431 P.2d 72, 76 (1967).

Mr. Schatz has also referred to us other decisions of similar portent. Page v. Means, 192 F.Supp. 475 (N.D.W.Va.1961); Pepper v. Evanson, 70 Wash.2d 309, 422 P. 2d 817 (1967), and others.

Notwithstanding the recency and sincerity of those decisions, we are of the opinion that they run contrary to the trend of decisions across the country and that the contrary position of the other decisions represents not only the majority view, but the better view.

The contrary view is perhaps best expressed in Clancy v. Pacenti, 15 Ill.App.2d 171, 145 N.E.2d 802, 71 A.L.R.2d 77 (1957).

In *Pacenti* the plaintiff claimed that the release was based on a mutual mistake of fact with respect to the nature and extent of injuries. The defendant claimed that the terms of the release were clear and certain and that by it the plaintiff released the defendant from all actions, damages, or demands arisen, arising, or growing out of any and all accidents or matters and especially the accident complained of. The facts in *Pacenti* were that at the time of the accident the plaintiff did not appear to be seriously injured and her doctor advised her that a muscle in her back was sprained. Although in *Pacenti* there was an additional fact not present in the instant case, that being that the defendant's doctor examined the plaintiff and it was his prognosis that the plaintiff would make a complete and satisfactory recovery, we do not believe that this fact materially affects the issue here under consideration. In *Pacenti* the settlement was negotiated on the basis of $90 to $100 property damage to the plaintiff's automobile and $50 to $60 representing injuries to the plaintiff. The accident occurred on December 22, 1950, and a release was obtained on March 1, 1951. Following the release, the plaintiff continued to have headaches and pain, saw various doctors, went to a hospital for two days, and remained in bed for a period of time, but was unable to get relief from increasing pain. She finally went to an orthopedic surgeon in July 1951. He examined her, took X rays, and diagnosed her condition as that of a herniated or ruptured intervertebral disc in the lower lumbar region. Following two operations, one on August 3, 1951, and one on September 29, 1951, she was finally discharged from the hospital November 3, 1951.

The trial court set aside the release as one based on mutual mistake of fact and in affirming the trial court's action, the appellate court said:

> We have not taken into account cases other than those involving personal injuries because personal injury cases in this respect are sui generis. Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757 at page 767, 164 A.L.R. 387. However, no rationale has been formulated for the special treatment of such cases. It appears to rest on the peculiar character of personal injuries. In such cases it is not an article of commerce that is involved, but the human mind and body, still the most complicated and mysterious of all the things that are upon or inhabit the earth. Here, mistakes are easily made and the consequences are more serious than in any other of the affairs of man. A slight abrasion may mean nothing or it may lead to a malignancy. Insignificant pain may mean the beginning of a fatal coronary attack or only a slight intestinal disturbance. Yet, a man cannot and does

not live in dread of these possibilities. He accepts assurances that all will be well, even though ultimate consequences cannot be appraised as in matters involving property or services. In Ricketts v. Pennsylvania R. Co., supra, 153 F.2d at page 767, Judge Frank, in a specially concurring opinion says:

"In all likelihood, it is because the courts have sensed the differentiated character of releases of personal injury claims that the 'modern trend' as Wigmore describes it, 'is to * * * develop a special doctrine * * * for that class of cases, liberally relieving the party who signed the release.' Wigmore, Evidence, § 2416."

The sharp economic inequality of the bargaining parties which generally exists in this class of cases has also been considered by the courts in their consideration of this doctrine. It is by no means as modern an innovation as to some may appear. Long before personal injury cases began to absorb the common law courts, the rule was applied to seamen in admiralty cases.

Clancy v. Pacenti, 15 Ill.App.2d 171, 145 N.E.2d 802, 71 A.L.R.2d 77, 81.

■ As the court in *Pacenti* was concerned about preserving a field of free action within which parties may compromise their differences with substantial assurance that the matter will not arise again, so are we so concerned. We take special cognizance in this case that a release covering personal injuries was taken by an insurance adjuster within three days of a collision under such circumstances as would make it difficult for anyone to know the nature and extent of the injury. In such a situation the risk of mutual mistake runs high. Any settlement of a personal injury claim within 30 days, if not within six months, of a collision between motor vehicles resulting in a totaling out of one of the vehicles and serious damage to the other might more likely than not involve

mutual mistake as to the nature and extent of injuries.

Because of the numerous decisions holding pro and con on the issue of rescission of a release under such circumstances and the variations which the decisions involve, we shall not attempt to discuss those decisions and variations in detail, but we do think it is pertinent to note what the writer of the annotation of which *Pacenti* is the leading case has to say on the subject generally.

While it is often said that the law favors compromise and accordingly the burden of proof is placed on one contending that a release was secured as the result of mistake or misrepresentation as to the nature or extent of the releasor's injuries, and in many jurisdictions such mistake or misrepresentation must be shown by clear and convincing evidence, there nevertheless appears to be a definite trend in most jurisdictions towards granting relief liberally where it is made to appear that an injured party released his claim under a false impression that he was fully informed as to the nature and extent of his injuries.

\*    \*    \*    \*    \*    \*

It is clearly possible for an injured party to consciously bargain away his right to recover for the consequences of another's tort notwithstanding the fact that the nature or extent of the injury has not been fully developed, and the mere fact that a bad bargain is made will not entitle the releasor to avoid his contract. However, it is equally clear that if the parties to a release were in fact laboring under a material mistake as to the nature or extent of the injuries, relief may be had and the release avoided in most jurisdictions.

71 A.L.R.2d, Personal injury—Release—Avoidance, § 2.

■ Following the *Pacenti* reasoning, we hold that the trial court was correct in its view that a mutual mistake of a material fact may justify rescission even of a re-

lease which by its terms covers unknown injuries.

The final specification of error is that the trial court erred in failing to dismiss for the reason that the plaintiff was estopped, waived the voidable contract, and was negligent.

As we previously stated, we have studied the transcript of the trial carefully and although the transcript discloses in more minute detail the facts leading up to the cashing of the check, we think that the facts as stated by Mr. Mitzel in his brief in response to this specification of error make sufficiently clear why the specification of error must be found to be unsupported by the evidence. The facts as so summarized and analyzed by Mr. Mitzel follow:

The plaintiff was injured in the automobile accident in question on November 15, 1965, and the release was taken on November 18, 1965. He cashed the draft which he received for the release on December 7, 1965. Defendant contends that the cashing of the draft on the latter date constitutes a ratification of the original release which now prevents the plaintiff from avoiding the release.

The evidence shows that the plaintiff originally saw Dr. Fleck on November 15, 1965, and he states he saw him several times within the next month, during which times Dr. Fleck simply told him the pills were reacting and led him to believe that things would clear up. On December 22, 1965, Mr. Mitzel saw Dr. Fleck again, who changed the pills. It was not until early January that his condition became such that he thought it was necessary to see other doctors which eventually resulted in the discovery of the subdural hematoma on January 15, 1966, and the operation on January 17, 1966. It is clear from the record that on December 7, 1965, the plaintiff had no more information regarding his true condition than he did when he signed the release on November 18, 1965.

Mr. Schatz, in support of his position that in cashing the draft Mr. Mitzel unequivocally ratified the contract of settlement, refers us to 76 C.J.S. Release § 32, as follows:

A voidable release may be ratified or confirmed by the statements or acts of the releasor. Likewise, a releasor may be precluded by estoppel or waiver from attacking the validity of his release; * *

* * * * * *

Ratification cures the invalidity, and gives the release the same force and effect as if executed without the circumstances which rendered it voidable; and when once a release has been affirmed it cannot afterward be disaffirmed.

We draw attention to a part of what Mr. Schatz deleted from § 32.

The fundamental test of ratification by conduct, it has been said, is whether the releasor, with full knowledge of the material facts entitling him to rescind, has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification.

In order to be held to have ratified, the releasor must or should have had knowledge of the material facts and circumstances; * * * There can be no binding ratification as long as the releasor is subject to the disabilities or impositions which made the contract voidable. * * *

76 C.J.S. Release § 32 (1952).

Under the facts of this case we find no estoppel, no waiver, no ratification, and no negligence.

The judgment is affirmed.

TEIGEN, C. J., and PAULSON, KNUDSON and STRUTZ, JJ., concur.