## No. 12,404.

YELLOWAY, INC. *v.* GARRETSON.
(3 P. [2d] 292)

Decided August 10, 1931.

Mr. C. Cooper Young, for plaintiff in error.

Mr. H. P. Vories, Mr. V. N. Stinson, for defendant in error.

*In Department.*

Mr. Justice Butler delivered the opinion of the court.

Olive Garretson, herein called the plaintiff, obtained a judgment for $1,000 against Yelloway, Inc., herein called the defendant. A reversal of that judgment is sought in this proceeding.

On April 9, 1927, the plaintiff was riding as a passenger in a motor-bus going north to Denver. About five miles north of Pueblo the bus collided with a south-bound Buick automobile. The plaintiff was injured as a result of the collision.

1. The defendant complains of certain instructions given by the trial court, and of the court's refusal to give certain requested instructions; but as the assignments of error do not set out the numbers of the court's

instructions complained of, or otherwise identify them, and as the abstract contains none of the instructions given by the court and none of the requested instructions, we will not consider these assignments of error. Supreme Court rule 32; *Ruby Chief Mining and Milling Co. v. Prentice,* 25 Colo. 4, 52 Pac. 210; *Knowlton v. Knight-Campbell Music Co.,* 59 Colo. 51, 147 Pac. 330; *Aetna Casualty & Surety Co. v. North Sterling Irrigation District,* 75 Colo. 185, 225 Pac. 261; *James v. Frank,* 76 Colo. 284, 230 Pac. 1114.

2. Nor will we consider the assignments of error based upon the admission of evidence. Such assignments of error do not refer to the folio numbers of the record where the rulings and exceptions appear. Supreme Court rule 32. Nor do they otherwise identify the evidence claimed to have been improperly admitted.

3. Another assignment of error is not entitled to consideration. It is that, ''The court erred in refusing to grant a motion for a new trial. No particular errors are specified. Supreme Court rule 32 contains this provision: ''A general assignment of error on the ground that a motion for new trial has been granted or denied, without specifying particular errors, will not be considered.''

4. Complaint is made of the court's refusal to grant the defendant's motion for a nonsuit. But after its motion was denied, the defendant proceeded with the trial and introduced evidence in support of the defense, and thereby waived the objection. *Denver, Texas & Fort Worth Railroad Co. v. Smock, Adm'x,* 23 Colo. 456, 48 Pac. 681.

There are three of the defendant's contentions that merit consideration: (1) That the relation of passenger and carrier did not exist between the plaintiff and the defendant; (2) that the driver of the bus was not negligent; and (3) that the plaintiff released the defendant from liability. Of these in their order.

██ 5. Did the relation of passenger and carrier exist between the plaintiff and the defendant?

R. W. Taggart, the defendant's president and general passenger agent, testified that the defendant was engaged in carrying passengers from Los Angeles to Denver at the time of the accident, and that the fare was $25. The plaintiff bought a ticket at Los Angeles for transportation by bus to Denver. She paid $25 therefor. The passenger ticket received by her had the printed heading, "Yelloway, Inc.," and bore the facsimile signature, "R. W. Taggart, General Passenger Agent," and the written signature, "A. Carson, Agent, Witness." The plaintiff's baggage check had printed on it, "Yelloway, Inc. Baggage Check." There were painted on the bus on which she rode the words, "Bonded, Yelloway, Inc." The defendant's Denver depot was at 1758 California street. The foregoing facts were established by uncontradicted evidence.

There was introduced in evidence a time table, admitted to be that of the defendant. It is headed, "Yelloway, Inc. Bus Service De Lux. Denver Depot, 1758 California St. * * * Effective May 1, 1927." Taggart testified that the time table had not been printed on April 9, 1927, the day of the accident; but that the only difference between it and the one in use on that date was that the one in effect on that date was not printed. The plaintiff testified that the printed time table in evidence, or one "approximately like it," was used by her on the trip; that she "watched the number of the stations and the schedule all the time." She also testified that Taggart never intimated that the defendant was not liable; that he took the stand that he was negotiating with the bonding company and that it was the bonding company that would pay her. Taggart denied this.

To meet the plaintiff's evidence, Taggart and Olsen, the driver of the bus, testified, in substance, that Olsen was "a contract carrier"; that he owned the bus and received a percentage. But Olsen also testified that he was

"a driver for the defendant" on April 9, 1927; and his testimony as to ownership was further weakened by the following testimony given by him at the coroner's inquest, which was held three days after the day of the accident: "Q. What is your business? A. Bus driver for the Yelloway. * * * Q. How long have you been employed by the Yelloway? A. Since the 15th of December, 1926." If Olsen was the owner of the bus, surely documentary evidence of his ownership was available, but none was produced.

There was sufficient evidence to justify the jury's finding that the relation of passenger and carrier existed between the plaintiff and the defendant.

 6. Was the driver negligent?

About 1:15 o'clock in the afternoon, the bus was approaching a narrow concrete bridge, 15 feet 11½ inches wide and 28 feet long. When the bus was about 300 or 400 feet south of the bridge, Olsen saw an automobile approaching from the north at a high rate of speed, from 40 to 50 miles per hour. It was about 660 feet from the bus. Olsen said that when he testified at the coroner's inquest that the automobile was about 200 feet from the north end of the bridge, he meant 200 yards; that he was sure he said yards. Olsen further testified that the automobile was wabbling, "as though it were in deep sand or something"; that it acted as though the steering apparatus was "out of fix"; that there was no question that he could cross the bridge before meeting the automobile, but that he slowed down; that he crossed the bridge; that he then turned to the left to avoid the automobile; that he did so "because of the impossibility of turning to the right because of the bridge and a telegraph pole"; that about 40 feet, a little more than the length of the bus, north of the bridge the collision occurred; that the bus had slowed down to 15 to 20 miles per hour when he turned to the left; that at the time of the collision the bus was going about 5 miles per hour. "I can stop my bus within fifty feet running at the rate of twenty-five miles

an hour. I could have stopped my bus on the south side of the bridge. Q. You didn't do it? A. I did not. Q. You kept on going to see if you could beat this woman to the bridge? A. I knew I could. Q. And you did? A. I did." When the collision occurred, the bus was on the left side of the road. The plaintiff testified that the automobile struck the right-hand fender of the bus; that just prior to the accident the bus was traveling about 30 miles per hour; that when she first saw the automobile, it was on the wrong side of the road, and was going in a rather uncertain direction; that if the bus had continued on the right-hand side, there would have been no accident.

The jury found that the driver of the bus was negligent, and that such negligence was the proximate cause of the accident. We cannot say that the finding was unsupported by the evidence.

7. Did the plaintiff release the defendant from liability?

The release claimed by the defendant consisted of a bank check, dated June 9, 1927, and signed, "Yelloway, Inc., R. W. Taggart, President-Treasurer." It is for $25, and on it is written, "in full of all claims and demands." Under the quoted words appears the signature of the plaintiff. On the face of the check are printed in small but readable type the words, "Your endorsement of this check acknowledges payment in full for the above." The plaintiff admitted endorsing the check and receiving cash therefor from Taggart, but claimed that the so-called release was obtained from her by trickery, misrepresentation and fraud. She testified that she had been in a hospital at Pueblo for about one month; that she suffered greatly, and required attention day and night; that after she left the hospital she continued to require attention, and for a while she was unable to raise her feet from the ground; that she suffered pain; that she went to Denver May 25; that a day or two later she went to the defendant's office; that Taggart said he would take

the matter up with the bonding company and get the company to adjust the case; that she saw Taggart again at the defendant's office about June 10; that he was getting ready to leave the city; that he said he would attend to her matter when he returned; that she inquired, "How am I going to live all the time?"; that he asked, "Are you running short?"; that she answered, "Yes"; that he said, "I can make an advancement to you." As to what followed, she testified as follows: "He called a young woman from an outer office and had her to bring a blank of some sort and asked me to sign my name to it. I asked him if I was signing a release, and he said 'No.' He showed me where to put my name down, and said 'On my word of honor you are not signing a release.' He said that if it were a release he would have to have a notary there. I never had the release in my possession. Q. What did he do, just hand it to you? A. Yes, he just leaned over and handed it to me as if he was holding it in place. Q. Did you turn it over? A. I don't recall as to that, he said, 'Well, if you sign it on the back.' Q. He turned it over? A. Yes. Q. You never did have it in your possession? A. No. Q. You don't know what it was? A. No. Q. Would you have signed it if you had known that it was a release and a receipt in full? A. Absolutely, I would not. * * * Q. Why didn't you read it [the release]? A. As I stated this morning, Mr. Taggart was in a hurry and he assured me on his word of honor I was not signing a release, that it was merely a receipt for the $25.00 he was giving me. After I had asked him two times I took his word for it rather than hold him up while I read it. * * * I never saw plaintiff's exhibit No. 1 [the check] after signing it until right now. * * * It was just a blank check, and it had printed matter on it but didn't have any writing on it; the first pen and ink put on it was when I signed, 'Olive Garretson.'" She told him she wanted cash, and he had her sign her name on the check, and then he gave her the cash and retained the check. She further testi-

fied that after she received the money she had ten or twelve interviews with Taggart about her claim; that he never intimated that the defendant was not liable, but claimed that he was negotiating with the bonding company, and that it was that company that would pay her; that not until the last interview, which was about August 14, was she informed that the defendant would not settle.

Taggart's testimony concerning the transaction was that he explained to the plaintiff that the defendant was not negligent and therefore could not pay her claim; that nevertheless, because of her apparent need, he would give her $25 for a full release; that she agreed; and that thereupon he handed her the check and release and she signed it.

There was sufficient evidence to warrant the submission to the jury of the question whether or not there was trickery, misrepresentation and fraud in obtaining the release from the plaintiff. The jury found that there was. That finding is conclusive in this proceeding. We cannot disturb it.

8. It is contended that the plaintiff was bound by the release; that one able to read must read before signing, or suffer the consequences. But there were in evidence circumstances sufficient to justify the jury in finding that there was no writing on the check when the plaintiff placed her name thereon, and that, by false representations and assurances, she was induced to sign her name and to refrain from reading the printed matter on the check. The circumstances detailed by the plaintiff were sufficient to relieve her from the charge of negligence in the transaction. *Roberts v. Colorado Springs & Interurban Railway Co.,* 45 Colo. 188, 101 Pac. 59. That the jury believed her testimony is evidenced by the verdict.

9. It is contended that, assuming that the release was obtained by fraud, the plaintiff retained the $25 and did not, before suit or in her pleadings, offer to

return it, and for that reason was not entitled to recover judgment. Under the instructions of the court, the jury deducted the $25 from the amount of damages assessed, and rendered a verdict for the balance. In the Roberts case, supra, we held that a plaintiff assailing a release for fraud practiced upon him in obtaining it, is not under duty, as a condition precedent to his action, to restore the amount paid him therefor; that the jury may make allowance for that amount in their verdict.

The several assignments of error are without merit.

The judgment is affirmed.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE HILLIARD and MR. JUSTICE ALTER concur.