**Irwin Duane GLEASON, Coin Fresh, Inc., a Colorado Corporation, and Mannings, Inc., a California Corporation, Petitioners,**

v.

**Darlene Benavidez GUZMAN, Respondent.**

**No. 79SC155.**

Supreme Court of Colorado.

Jan. 5, 1981.

Rehearing Denied March 2, 1981.

Tilly & Graves, Ronald H. Shear, Denver, for petitioner Mannings, Inc.

Pryor, Carney & Johnson, Thomas L. Roberts, Englewood, for petitioners Irwin Duane Gleason and Coin Fresh, Inc.

Carroll & Bradley, P. C., Rebecca L. Bradley, Westminster, for respondent.

QUINN, Justice.

We granted certiorari to review the court of appeals' decision in *Guzman v. Gleason*, Colo.App., 598 P.2d 145 (1979), which addressed the issue of mistake in connection with the execution of a guardian's release for his daughter's personal injury claim. The trial court had granted the defendants' motion for summary judgment on the ground that any mistake in the execution of the release was a unilateral mistake in the prognosis for recovery rather than a mistake about the nature of the injury. The court of appeals reversed and remanded, holding that there was a genuine issue of

fact as to the nature of the mistake and summary judgment was inappropriate. We affirm the court of appeals.

On September 29, 1970, Darlene Benavidez, then a fourteen-year-old minor, was struck on the head by a vending machine that fell from a truck operated by Irwin Gleason in the course of his employment with Coin Fresh, Inc. (defendants). Darlene Benavidez has since married and is now known as Darlene Guzman (plaintiff). Immediately after the accident she was taken to Denver General Hospital for examination. She complained of headache, vomiting and some disorientation and, after two days of observation and testing, her injury was diagnosed as a left temporal lobe contusion and she was released as improved. On October 13, 1970, the plaintiff was readmitted to the hospital with complaints similar to those previously experienced. Further testing resulted in a diagnosis of left intratemporal lobe hematoma and the plaintiff was discharged as improved on October 20, 1970. Shortly thereafter plaintiff returned to high school and a normal routine. She and her parents, Mr. and Mrs. Benavidez, believed that plaintiff had fully recovered from the injury.

In November 1970 the plaintiff's parents retained an attorney in connection with their daughter's claim. Approximately two years later this attorney initiated settlement negotiations with the defendants' insurance carrier. It was mutually agreed that the case be settled for $6,114.35. The insurance carrier hired an attorney to prepare a petition for the probate court's approval of the settlement and the appointment of the plaintiff's father, Mr. Benavidez, as guardian of his minor daughter's estate. The probate court approved the settlement and Mr. Benavidez, as duly appointed guardian, executed a general release of his daughter's claim against the defendants.

In May 1974, approximately forty-four months after the accident, the plaintiff experienced her first epileptic seizure during her senior year in high school. Other seizures followed. Having become emancipated through marriage, she retained her present attorneys and a complaint was filed in November 1975. The complaint sought money damages against the defendants for negligently causing personal injuries to the plaintiff in the accident of September 29, 1970. The defendants in their answer raised as an affirmative defense the release executed by the guardian and endorsed on their answer a demand for a jury trial. Thereafter, the defendants filed a motion for summary judgment on the basis of the guardian's release. The plaintiff countered with a motion to set aside the release on the ground that it was executed under a mistake as to the nature of the injury actually sustained. The court heard both motions in a consolidated hearing on November 14, 1977.

At the commencement of the motions-hearing the attorneys advised the court that the two pending motions involved the identical issue: the validity of the release. The plaintiff's attorney then offered to proceed to a court trial on this issue and to accept the court's decision as the final judgment in the matter. However, the defendants' attorney rejected the offer and stated to the court that he expected the court to rule on the issue within the format of a summary judgment proceeding. At this point the court stated: "This is a summary judgment—I mean, I am just going to rule on the things before me." [1]

---

1. The colloquy between counsel and the court at the commencement of the hearing went as follows:

MR. CARROLL (plaintiff's attorney): "Also, I understand that we are agreeing that the Court will hear this issue today and that the matter will not be submitted to a jury; is that your understanding, or are we going to litigate it before a jury?

MR. PRYOR (defendant's attorney): "Well, I think the issue of a summary judgment is as it always is with a summary judgment. The Court can rule as a matter of law. The Court could always find that there is some issue of fact, but we would certainly expect the Court to rule on the—and request that the Court rule—on the validity of the release because that is the entire heart of this lawsuit at this point.

During the motions-hearing the plaintiff presented a neurologist who testified that the first diagnosis of post-traumatic epilepsy was made after the first seizure in 1974. He also stated that a monitored program of intermittent electroencephalographic testing between the accident and the seizure would not have necessarily disclosed the epileptic condition. The affidavits and testimony of the plaintiff and her parents established that they were never informed of actual or potential epilepsy with respect to the injury suffered and that the release would not have been executed if they were aware of any risk of that condition developing.

During legal argument at the motions-hearing the defense attorney made reference to pleadings, affidavits, deposition testimony and pertinent legal authority for the purpose of establishing the factual and legal predicates for summary judgment under C.R.C.P. 56(c). Approximately three weeks after the hearing the court entered a written order granting the defendants' motion for summary judgment and denying the plaintiff's motion to set aside the release for the following reasons:

"The Court finds that the facts of this case are governed by *Davis v. Flatiron Materials Co.*, 182 Colo. 65, 511 P.2d 28 (1973). Any mistake existing at the time the release was executed was not a mutual mistake of fact, but rather a unilateral mistake of prognosis by the plaintiff.... At the time the release was executed, the plaintiff should have known that traumatic epilepsy could result from her injury."

MR. CARROLL: "We have filed a motion to set aside the release, too, and both matters are before Your Honor, and what I think we are stipulating to is that His Honor's decision today will be the decision at this level and the trial court level on that particular issue; is that correct?

MR. PRYOR: "I would like—I guess I always look under rocks. I would like to hear the Court's ruling before I make any stipulation as to what I'll do before I know what the finality of the ruling is. We are here because we think we have a valid release, and we think it is an issue of law as to whether the release is a bar to the claim that is being made.

The court of appeals reached an opposite conclusion, finding this case indistinguishable from *Scotton v. Landers*, 190 Colo. 27, 543 P.2d 64 (1975), and holding that "there was evidence upon which the trier of fact could well conclude that the settlement was based on a basic mistake."

The defendants raise alternate arguments for reversal of the court of appeals. First, they argue that the plaintiff was not entitled to a jury trial on the issue of mistake in the execution of the release and, therefore, the trial court's denial of the plaintiff's motion to set aside the release constituted an adjudication on the merits. Alternatively, they claim that the trial court properly granted summary judgment because any mistake was a unilateral mistake in prognosis as to the plaintiff's future course of recovery from a known injury and not a mistake as to the nature of the injury itself.

## I. The Effect of the Motions-Hearing on the Right to a Jury Trial

The defendants assert that the court's denial of the plaintiff's motion to set aside the release constituted an adjudication on the merits. Their argument stems from two inferences which they believe find support in the record: (1) the filing of the motion to set aside the release invoked the equity jurisdiction of the court and transformed the character of the action from a legal to an equitable one for which a jury trial was inappropriate; and (2) the plaintiff's presentation of evidence in support of the motion effected a waiver of a jury trial on all issues relating to the release. Our

THE COURT: "This is a summary judgment—I mean, I am just going to rule on the things before me.

MR. CARROLL: "Well, Your Honor, also before you is a motion to set aside the release.

THE COURT: "Yes. Well, I figure that's a jury question, so I don't know why we're talking about juries for.

MR. PRYOR: "The two motions address the same question. We are here to see if this release is any good.

THE COURT: "As I say, all I'm going to decide is what's before me."

interpretation of the record is different from that urged by the defendants.

The record clearly demonstrates that the district judge considered both motions—the defendants' motion for summary judgment and the plaintiff's motion to set aside the release—under the rubric of summary judgment proceedings. When he heard and ruled on the motions he was not acting as a chancellor in equity or as the ultimate trier of fact, but as a judge determining that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." C.R.C.P. 56(c).

Contrary to the defendants' argument, the plaintiff's filing of the motion to set aside the release did not transform the character of the proceedings from a legal to an equitable one. Although there is no constitutional right to a jury trial in civil cases in Colorado, *Colo.Const.* Art. II, Sec. 23; *Johnson v. Neel*, 123 Colo. 377, 229 P.2d 939 (1951); *Parker v. Plympton*, 85 Colo. 87, 273 P. 1030 (1928), C.R.C.P. 38(a) provides that an issue of fact must be tried to a jury upon demand in an action for personal injuries. Here, the complaint sounds in negligence and seeks relief in the form of money damages. Historically, actions to recover money damages for personal injuries are legal, not equitable, and upon proper demand should be tried to a jury rather than the court. 5 *J. Moore, Federal Practice* § 38.11[5] and § 38.19[1] (2d ed. 1980). In Colorado "whether an issue of fact must be tried to a jury ... depends upon the character of the action in which the issue is joined." *Setchell v. Dellacroce*, 169 Colo. 212, 215, 454 P.2d 804, 806 (1969); *see Miller v. District Court*, 154 Colo. 125, 388 P.2d 763 (1964); *Esselstyn v. United States Gold Corp.*, 59 Colo. 294, 149 P. 93 (1915); *Jacobs v. Prudential Ins. Co.*, 35 Colo.App. 423, 533 P.2d 516 (1975); *Miller v. Carnation Co.*, 33 Colo.App. 62, 516 P.2d 661 (1973).

The plaintiff's motion to set aside the release no more impacted on the basic character of the action than did the defendants' assertion of the affirmative defense of release in their answer. In fact, the defendants acknowledged implicitly the legal character of this action by endorsing on that answer a demand for a jury trial pursuant to C.R.C.P. 38(b). Notwithstanding the issue relating to the validity of the release, the action remains essentially a tort action for money damages triable to a jury. *See, e. g., Callen v. Pennsylvania Railroad Co.*, 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242 (1948); *McCarthy v. Eddings*, 109 Colo. 526, 127 P.2d 883 (1942); *Oman v. Mishler*, 92 Colo. 476, 22 P.2d 132 (1933); *Yelloway, Inc. v. Garretson*, 89 Colo. 375, 3 P.2d 292 (1931).

The defendants' argument that the plaintiff waived a jury trial by presenting evidence at the motions-hearing is similarly unpersuasive. The plaintiff's motion to set aside the release was filed in contravention of the defendants' motion for summary judgment. In view of the court's statement at the commencement of the motions-hearing that "this is a summary judgment" proceeding, the plaintiff's proffered testimony at that hearing apparently was directed to the establishment of sufficient factual issues so as to render a summary judgment for the defendants inappropriate.

Moreover, a demand for a trial by jury by one party may not be withdrawn without the consent of all parties. C.R.C.P. 38(d); *Forster v. Superior Court*, 175 Colo. 444, 488 P.2d 202 (1971); *see also Young v. Colorado National Bank*, 148 Colo. 104, 365 P.2d 701 (1961); *Jaynes v. Marrow*, 144 Colo. 138, 355 P.2d 529 (1960). Here, the plaintiff offered to waive a jury trial on the issues relating to the release but the defendants precluded that offer from ripening into a waiver. Since the defendants refused to waive a jury trial, the motions-hearing was not converted into a trial on the merits.[2] Thus, the court's determination of the defendants' motion for summary judgment must be evaluated under the standards appropriate for that proceeding.

---

**2.** The trial court has authority to order a separate trial on the issue of the release preliminary to the principal claim in furtherance of convenience or to avoid prejudice. C.R.C.P. 42(b). However, it did not do so here.

## II. *The Propriety of Summary Judgment*

The defendants urge two reasons why the court of appeals erred in reversing the trial court's entry of summary judgment. First, they argue that the mistake related to a future complication of a known injury, as distinct from a mistake about the nature of the injury actually suffered in the accident. Next, they contend that the release was a general release encompassing both known and unknown injuries and it thereby precluded rescission even for a mistake as to an unknown injury.

Since these arguments are presented to us in the context of a summary judgment review, the determinative considerations are whether the record shows a genuine issue as to any material fact and whether the defendants are entitled to judgment as a matter of law. C.R.C.P. 56(c). Summary judgment is a drastic remedy and should be granted only where the evidential and legal prerequisites are clearly established. *E. g., McKinley Construction Co. v. Dozier*, 175 Colo. 397, 487 P.2d 1335 (1971); *Primock v. Hamilton*, 168 Colo. 524, 452 P.2d 375 (1969); *Flanders v. Kochenberger*, 118 Colo. 104, 193 P.2d 281 (1944); *Hatfield v. Barnes*, 115 Colo. 30, 168 P.2d 552 (1946). Having due regard for these stringent standards of review and after careful consideration of the record before us, we reject defendants' contentions.

### A. *Mistake as a Basis For Avoidance of Release*

■ Cases addressing the problem of mistake in the settlement of personal injury claims reflect a tension stemming, on the one hand, from the general need for finality in the contractual settlements of actual or potential lawsuits and, on the other hand, from a recognized need to alleviate the distorting and unintended effects which human error can impose on a transaction. *See, e. g.*, II *G. Palmer, The Law of Restitution* § 11.2, 12.22 (1978); Dobbs, *Conclusiveness of Personal Injury Settlements: Basic Problems*, 41 *N.C.L.Rev.* 665 (1963); Note, *Avoidance of Tort Releases*, 13 *W.Res.L. Rev.* 768 (1962); Havighurst, *Problems Concerning Settlement Agreements*, 53 *Nw.U.*

*L.Rev.* 283 (1958). Although the approaches are not totally discrete, they do lean in different directions. One approach denies rescission even though the injuries were not known or suspected at the time of the settlement. *E. g., Tewksbury v. Fellsway Laundry*, 319 Mass. 386, 65 N.E.2d 918 (1946). Under this view the releasor assumes the risk that the nature and extent of known injuries might be more severe than was believed at settlement. Another approach allows rescission based on any mistake as to the condition of the injured claimant, whether the mistake relates to the nature of the injuries or to their further consequences. *E. g., Graham v. Atchison, T. & S. F. Ry. Co.*, 176 F.2d 819 (9th Cir. 1949); *Robert Hind, Ltd. v. Silva*, 75 F.2d 74 (9th Cir. 1935); *Reed v. Harvey*, 253 Iowa 10, 110 N.W.2d 442 (1961). Midway between these approaches is the view that rescission is available for mistakes relating to the nature of known injuries but not for mistakes as to the future course and effects of those injuries. *E. g., Casey v. Proctor*, 59 Cal.2d 97, 378 P.2d 579, 28 Cal.Rptr. 307 (1963); *Hall v. Strom Constr. Co.*, 368 Mich. 253, 118 N.W.2d 281 (1962); *Farrington v. Harlem Sav. Bank*, 280 N.Y. 1, 19 N.E.2d 657 (1939); *Doyle v. Teasdale*, 263 Wis. 238, 57 N.W.2d 381 (1953). The assumption here is that rescission must be based on mistake, and mistake for legal purposes must relate to a past or present fact rather than an opinion or prophecy about the future. *See* II *G. Palmer, supra* at § 12.22.

This latter approach represents the rule in this jurisdiction. It was presaged in *McCarthy v. Eddings, supra*. There the plaintiff suffered a broken arm but, based on his doctor's representation, believed that the injury was temporary in duration and executed a release. Thereafter, he discovered that the broken bones in the arm had not united and the resulting disability was permanent. We affirmed the jury verdict for the plaintiff and held that a release obtained as the result of a mutual basic mistake could be set aside as ineffective.

The *McCarthy* rule was further refined in *Davis v. Flatiron Materials Co.*, 182 Colo.

65, 511 P.2d 28 (1973), which upheld the validity of a release in the context of a known aggravation of pre-existing cervical osteoarthritis from an automobile accident. After executing a release Mrs. Davis experienced a worsening of symptoms, was involved in another accident, and subsequently underwent spinal surgery. Noting that the injury was correctly diagnosed and that the plaintiff was fully informed about the nature of her condition, we held that to justify rescission the mistake "must relate to a present existing fact or a past fact," *Id.* at 71, 511 P.2d at 31, rather than as there present, a mistake concerning the future course of recovery from the known injury.

We again addressed this problem in *Scotton v. Landers,* 190 Colo. 27, 543 P.2d 64 (1975), where the plaintiff, believing that he suffered a fractured rib and bruises in an automobile accident, executed a general release only to discover shortly thereafter that his spleen had been ruptured and had to be surgically removed. We concluded that the mistake was sufficient to avoid the release because it was grounded in the nature of injuries suffered in the accident.

As *McCarthy, Davis* and *Scotton* demonstrate, the distinction between unknown injuries and unknown consequences of known injuries is a useful analytic standard but it does not yield a litmus-type resolution to these problems. The words we use, "though they have a central core of meaning that is relatively fixed, are of doubtful application to a considerable number of marginal cases." Williams, *Language and The Law,* 61 *L.Q.Rev.* 179, 191 (1945), quoted in *Ricketts v. Pennsylvania R. Co.,* 153 F.2d 757, 765, n. 28 (2d Cir. 1946) (Frank, J., concurring). Indeed, this is such a marginal case. With respect to post-traumatic epilepsy, the margin of difference between a mistake in diagnosis and a mistake in prognosis, or the difference between that condition as an injury and as a consequence, cannot easily be fitted into predetermined categories of exclusivity.[3]

Judge Learned Hand pointed up the difficulty of conceptual differentiation in these matters:

"There is indeed no absolute line to be drawn between mistakes as to future, and as to present facts. To tell a layman who has been injured that he will be about again in a short time is to do more than prophesy about his recovery. No doubt it is a forecast, but it is ordinarily more than forecast; it is an assurance as to his present condition, and so understood." *Scheer v. Rockne Motors Corp.,* 68 F.2d 942, 945 (2d Cir. 1934).

A similar view was cogently voiced in *Clancy v. Pacenti,* 15 Ill.App.2d 171, 145 N.E.2d 802 (1957):

"In such cases it is not an article of commerce that is involved, but the human mind and body, still the most complicated and mysterious of all the things that are upon or inhabit the earth. Here, mistakes are easily made and the consequences are more serious than in any other of the affairs of men. A slight abrasion may mean nothing or it may lead to a malignancy. Insignificant pain may mean the beginning of a fatal coronary attack or only a slight intestinal disturbance. Yet, a man cannot and does not live in dread of these possibilities. He accepts assurances that all will be well, even though ultimate consequences cannot be appraised as in matters involving property or services." *Id.* at 176–77, 145 N.E.2d at 805.

---

**3.** The line of differentiation will vary with the level of analysis. An intratemporal lobe hematoma is a collection of blood, usually clotted, within the temporal lobe. It may but need not cause permanent damage to the brain. In contrast, post-traumatic epilepsy is a clinical diagnosis that is based on the presence of seizures and indicates brain dysfunction. *See generally* 8A *L. Chapman, Courtroom Medicine,* § 170.00 *et seq.* (1972); 4 *Traumatic Medicine and Surgery for the Attorney,* § 806 *et seq.* (1961). From the standpoint of medical etiology, post-traumatic epilepsy might be characterized as a consequence of an intratemporal lobe hematoma. A medical diagnosis of intratemporal lobe hematoma, however, does not subsume a condition of post-traumatic epilepsy. So too, within the framework of legal causation, post-traumatic epilepsy might be characterized as an effect of the underlying trauma caused in an accident. The two conditions, however, are not synonymous for purposes of damages.

■ Mistake, by its very nature, involves an erroneous state of mind about an external fact. II *G. Palmer, supra,* § 11.4. It may stem from a tacit presupposition of an untrue fact or from ignorance of an existing fact. *Id.* An inquiry into its existence is essentially factual in character. In *Scotton v. Landers, supra,* we noted that in cases raising the issue of mistake in the execution of a release for a personal injury claim the prime and determinative consideration is whether "the injured party released his claim under a mistaken or false impression that he was fully informed as to the nature of his injuries." 190 Colo. at 29–30, 543 P.2d at 66.

Knowledge of the nature of an injury requires an awareness and some appreciation of its extent, severity and likely duration. *See, e. g., Scheer v. Rockne Motors Corp., supra; McCarthy v. Eddings, supra; Backus v. Sessions,* 17 Cal.2d 380, 110 P.2d 51 (1941); *Clancy v. Pacenti, supra; Jordan v. Brady Transfer & Storage Co.,* 226 Iowa 137, 284 N.W. 73 (1939); *Mitzel v. Schatz,* 175 N.W.2d 659 (N.D.1970); *Poti v. New England Road Machinery Co.,* 83 N.H. 232, 140 A. 587 (1928). Admittedly, line-drawing here is difficult and its direction may well vary with the thrust of evidence. These basic components of knowledge, however, relate primarily to a comprehension of the basic character of the injury as distinct from a prediction or opinion about the future course of recovery when its basic nature is otherwise known.

■ Thus the determinative issue here is whether, viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences therefrom in her favor, *e. g., Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Die-*

bold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Clancy v. Pacenti, supra;* 6 *J. Moore, Federal Practice* § 56.15[1.-00] and § 56.15[3] (2d ed. 1980), there is a genuine factual issue that the guardian was mistaken about the nature of his daughter's injury when he executed the release.[4] In determining this question we focus on what the guardian, as a layman, knew about the injury, and not what the opinion of a highly specialized physician may have been. *Le Francois v. Hobart College,* Sup., 31 N.Y. S.2d 200 (1941), *aff'd,* 262 App.Div. 802, 28 N.Y.S.2d 744 (1941), *aff'd,* 287 N.Y. 638, 39 N.E.2d 271 (1941).

■ The record before us provides an adequate basis from which one may reasonably infer the existence of mistake in the execution of the release by the guardian. He had little formal education and was not adept or articulate in the English language. According to the deposition testimony of the attorney who originally represented the plaintiff, the most sophisticated concept used by the guardian in connection with the injury was "concussion".

As noted by the court of appeals, from the date of the accident through the settlement the plaintiff experienced only minor symptoms. It may reasonably be inferred that when the release was executed the guardian believed the injury was minor, that it posed no risk of complication, that it was temporary in duration, and that his daughter had fully recovered. There is no evidence that anyone, including physicians and the original attorney, disabused the guardian of these beliefs. In fact, the attorney's legal preparation and his settlement correspondence to the defendants' insurance carrier belie any awareness that the injury posed any risk of brain dysfunction, much less post-traumatic epilepsy.[5]

4. Although the rule of rescission is stated in terms of "mutual mistake," "courts actually rescind on a finding that the injured party was mistaken, typically that he was unaware of a certain injury. Usually, the other party also will be unaware of the injury, but there is no need to inquire into his state of mind. If he knew or suspected that there was another injury, the case for rescission would be strong-

er. . . ." II *G. Palmer, The Law of Restitution,* § 12.22(c) at 712–13 (1978). *See, e. g., Casey v. Proctor,* 59 Cal.2d 97, 378 P.2d 579, 28 Cal. Rptr. 307 (1963); *Denton v. Utley,* 350 Mich. 332, 86 N.W.2d 537 (1957).

5. In the initial settlement letter of July 28, 1972, the attorney stated that the plaintiff appears to have fully recovered and "upon the present presumption that there is no permanency to

This attorney's belief that the plaintiff had fully recovered from her injury is clearly discernible in his representations to the probate judge at the settlement hearing:

"I am pleased to report to the Court that from all indications, including the final memo from Denver General [Hospital], which is dated a few days ago, she has fully recovered . . . and while she had to stay home six weeks to recover, she advises me that she lost no school credits and will, in fact, graduate in good standing from West High School this fall at the age of seventeen years."

When the record is examined in its entirety, it is apparent that there exists a genuine factual issue on whether the guardian was mistaken about the nature of his daughter's injury when he executed the release.[6] Under these circumstances, summary judgment was inappropriate. *See, e. g., Adickes v. S. H. Kress & Co., supra; United States v. Diebold, Inc., supra; Widman v. Ashcraft,* 117 Colo. 373, 188 P.2d 889 (1947); *Hye v. Riggin,* 58 Del. 275, 208 A.2d 513 (1964); *Thomas v. Sheehan,* 260 Iowa 618, 149 N.W.2d 842 (1967); *Frankenheim v. B. Altman & Co.,* 1 App.Div.2d 200, 149 N.Y. S.2d 11 (1956); *Mitzel v. Schatz, supra; Smith v. Chicago Rock Island & Pac. R. R. Co.,* 525 P.2d 1404 (Okl.App.1973); *Warren v. Crockett,* 211 Tenn. 173, 364 S.W.2d 352 (1962); *Reynolds v. Merrill,* 23 Utah 2d 155, 460 P.2d 323 (1969). Similarly, the record fails to demonstrate that the defendants are entitled to judgment as a matter of law. The district court could not properly have

concluded that, as a matter of law, the mistake was solely "a unilateral mistake of prognosis" rather than a mistake as to the nature of the underlying injury.

### B. *The Scope of the Release*

The defendants argue that the guardian's release constitutes a bar to the plaintiff's claim as a matter of law because its terms are all inclusive and encompass unknown injuries that may later develop or be discovered as well as their effects and consequences.

Although some jurisdictions give effect to the language of a release so as to preclude avoidance even as to unknown injuries, the tendency of the law is to the contrary. II G. Palmer, *supra,* § 12.22 at 711. Most courts provide for avoidance in appropriate circumstances, such as mistake or lack of intent, despite the presence of language in the release broad enough to cover the claim in question. *E. g., Ciletti v. Union Pac. R. Co.,* 196 F.2d 502 (2d Cir. 1952); *Atlantic Greyhound Lines, Inc. v. Metz,* 70 F.2d 166 (4th Cir. 1934), cert. denied, 392 U.S. 562, 55 S.Ct. 73, 79 L.Ed. 662 (1934); *Casey v. Proctor, supra; Clancy v. Pacenti, supra; Aronovitch v. Levy,* 238 Minn. 237, 56 N.W.2d 570 (1953); *Landau v. Hertz Drivurself Stations,* 237 App.Div. 141, 260 N.Y.S. 561 (1932); *Mitzel v. Schatz, supra; Kirchgestner v. Denver & R. G. W. R. Co.,* 118 Utah 20, 218 P.2d 685 (1950).

In *Scotton v. Landers, supra,* we held that before a general release, such as here present, will constitute a bar to a claim

---

her damages," he offered to settle the case for $9,500. The bills for the two hospitalizations in September-October 1970 amounted to $1,457.35, and damage to the plaintiff's clothing and eyeglasses amounted to $147. These amounts were included within the $9,500 offer. The insurance carrier rejected the offer and made a counter offer of $6,114.35, which was the amount for which the case was ultimately settled.

The attorney's belief that the plaintiff's injury was not serious is further corroborated by his minimal investigation and work-up of the case prior to settlement. In his deposition he stated that he did not file a complaint because he wanted to wait and see if the injury was serious. There was very little contact between him and the Benavidez family from November 1970

until July 1972 when, believing that the plaintiff had fully recovered, he commenced settlement negotiations with the defendants' insurance carrier.

**6.** The probate court's approval of the settlement has no effect on the underlying issue of mistake:

"We find no persuasive reason why a minor, *whose claims cannot satisfactorily be compromised and released except through court approval, should be more rigorously denied relief than an adult from mutual mistake, simply because the court was laboring under the same mistake." Scherer v. Ravenswood Hospital Medical Center,* 21 Ill.App.3d 637, 639, 316 N.E.2d 98, 100 (1974).

for an unknown injury "it must appear from the circumstances surrounding the transaction that such was [the releasor's] clear intention." 190 Colo. at 31, 543 P.2d at 67. Resolution of the intent issue necessarily means going behind the language of the release. If unknown injuries were not within the contemplation of the parties, the release will be set aside. *E. g., Scotton v. Landers, supra; Dansky v. Buck*, 92 Ariz. 1, 373 P.2d 1 (1962); *Aronovitch v. Levy, supra.*

 Our holding that there was sufficient evidence of mistake as to the nature of the injury so as to preclude summary judgment dictates a like result on the scope of the release. It cannot be argued seriously that, as a matter of law, the guardian intended to release the defendants for future unknown injuries or the later consequences of known or unknown injuries where there is evidence that he was not fully aware of the basic character of the primary injury for which the release was sought and executed.

The judgment of the court of appeals is affirmed.

ERICKSON, J., specially concurs in part in the result.

HODGES, C. J., and ROVIRA, J., dissent.

ERICKSON, Justice, specially concurring in part in the result, but for reasons different than those set forth in the opinion by QUINN, J.

## I.

### Procedure

I concur in the majority's conclusion that the procedural errors which occurred require reversal of the trial court's granting of summary judgment, but disagree with the opinion of Justice Quinn as to the standards for determining the finality of a release and the directions for trial.

In 1975, the plaintiff filed her complaint for money damages based on personal injuries sustained in 1970. In their answer, the defendants raised the affirmative defense

of release, C.R.C.P. 8(c), and endorsed a demand for a jury trial, C.R.C.P. 38(b). At this point, a question of fact existed as to the validity of the release, and the jury, as the trier of fact, should have resolved that issue along with all other factual questions in the case. *McCarthy v. Eddings*, 109 Colo. 526, 127 P.2d 883 (1942). We held in *McCarthy v. Eddings, supra*, that mutual mistake of fact is an issue which is properly submitted to the jury.

The fact that defendants filed a motion for summary judgment and that the plaintiff then filed a motion to set aside the release, does not change the fact that the original complaint sought legal relief in the form of money damages, and that the validity of the release was a question of fact to be determined by the jury. C.R.C.P. 38(a). *See Miller v. District Court*, 154 Colo. 125, 388 P.2d 763 (1964); *Jacobs v. Prudential Insurance Co.*, 35 Colo.App. 423, 533 P.2d 516 (1975). Since the defendants refused to waive a jury, the trial court could not determine factual issues and use those findings of fact to support a summary judgment. *Jaynes v. Marrow* 144 Colo. 138, 355 P.2d 529 (1960).

Throughout the proceedings the trial court determined the admissibility of evidence on the theory that the hearing was on a motion for summary judgment. It is obvious from the record that the same evidence was not presented at the hearing on the motion for summary judgment that would have been presented at the time of trial. Affidavits and depositions constituted a substantial part of the record which provided the basis for the trial court's summary judgment.

## II.

### Prognosis versus Diagnosis

I agree that the release may be set aside where it was obtained as a result of a mutual mistake of fact based upon a mistake in diagnosis. *Scotten v. Landers*, 190 Colo. 27, 543 P.2d 64 (1975); *McCarthy v. Eddings*, 109 Colo. 526, 127 P.2d 883 (1942). Conversely, mistakes in prognosis will not

support the setting aside of a valid release contract. *Davis v. Flatiron Materials Co.*, 182 Colo. 65, 511 P.2d 28 (1973); *McCarthy v. Eddings, supra.* The rule has been stated succinctly as: "In general our law has been of the view that each party takes his chances as to the future, and an incorrect prediction provides no basis for avoidance of a contract." *G. Palmer,* II. *The Law of Restitution* § 12.22 (1978).

The fine line between diagnosis and prognosis, however, is often difficult to draw. The difference has been defined as:

"Diagnosis . . . means the act of recognizing the presence of disease, from its signs or symptoms and deciding as to its character, or the decision arrived at from such symptoms. Prognosis is the act or course of termination of a disease."

*Branham v. Gardner,* 383 F.2d 614, 622 (6th Cir. 1967).

The factual foundations for both *Scotten v. Landers, supra,* and *Davis v. Flatiron, supra,* provide guidance to the courts in determining whether a release should be set aside, but neither case fully answers the factual issues in this case.[1] It is possible to view the facts of this case as the trial court did, and to conclude that *Davis v. Flatiron, supra,* dictates that the release precludes further recovery.[2] However, it is also possible to interpret portions of the record so as to bring the facts within *Scotten v. Landers, supra.*[3]

In this case, the nature of the injury was known, but there was an incorrect prediction as to its future consequences. The minor plaintiff who was injured was given medical treatment and evaluated for a period of two years. She was under the care of a doctor who made a full report to the court before the settlement was finalized. As a result, a guardian was appointed for her

---

1. "*Head injury* is a major cause of acquired epilepsy, the seizures occurring both in the acute phase and as a chronic residual. The incidence of epilepsy after head injury is difficult to determine, because of the great variability of injury. General surveys report an incidence of up to 10 per cent after closed-head injury and between 30 and 40 per cent after open-head injuries, seizures developing in most cases within three years. The seizure incidence is highest when the wound is severe, when the dura is penetrated, and when the injury involves the nolandic or parietal regions." P. Beeson & W. McDermott, *Textbook of Medicine,* 725 (1975).

2. The following testimony was presented at the hearing on the issue of a mistake in diagnosis versus prognosis:
MR. PRYOR: "What you're really saying—for the purpose of this motion—is that traumatic epilepsy isn't a separate and distinct injury in this case, but a complication of the intra-temporal hematoma?"
DR. RYAN: "Yes. It is an injury to the brain. This could have been a contusion. In other words, just an area of swelling around a hematoma. There is no direct visualization. Otherwise, there is direct brain injury to the left temporal lobe, and subsequently after this happened and maturity, she developed overt seizures."
MR. PRYOR: "So in this particular case, then, the fact that the patient developed traumatic epilepsy was a complication of a head injury in 1970?"
DR. RYAN: "Yes, a direct result of it."

MR. PRYOR: "Okay. Now, is traumatic epilepsy a recognized and yet an infrequently occurring complication of a closed head injury or an intratemporal hematoma?"
DR. RYAN: "It is a recognized complication of this kind of injury."

\* \* \* \* \* \*

MR. PRYOR: "What I am getting at, it is a complication of a known injury?"
DR. RYAN: "Yes, yes. It was a complication of that injury, but the epilepsy wasn't present at the time of the injury or even—you know—recently in the few months or weeks or even a year or so after the injury. The epilepsy was really present when she had her first seizure, as far as I could tell."

3. Dr. Ryan also testified that "[U]nless you have an electroencephalograph or E.E.G. or evidence of seizures electrically, there is no way to tell at that time that the [person has] epilepsy." He testified further that "[t]he problem was there . . . since the accident . . . but she plaintiff didn't have a seizure [epilepsy] until '74. . . . The epilepsy was diagnosed in 1974."

Both the father, who was the guardian, the mother, and the plaintiff, testified that they did not know and were not advised of the possibility of future epileptic seizures. Dr. Ryan was not the treating doctor at the time the initial injury was incurred in 1970. Moreover, the treating doctor was not called, and the sole medical testimony was that provided by Dr. Ryan.

and an extended evidentiary hearing was held before the probate court to determine whether the release should be approved. The court requested that an additional neurological examination be made, but the minor's father, who was her court-appointed guardian, agreed that the matter should be settled once and for all. Based on the foregoing factors, the court approved the settlement.

The amount paid in settlement of the claim was approximately two and one-half times the special damages, which has commonly been used as a formula for estimating the value of a personal injury claim.

In my view, the issue of whether the future consequences of the injury was a mistake in diagnosis or prognosis, is an issue of fact which is properly determined by the trier of fact. In *Melvin v. Stevens*, 10 Ariz.App. 357, 458 P.2d 977 (1969), the court concluded:

"The line between injuries which are unknown in nature or extent and injuries which are known but develop unknown consequences can in some circumstances be a narrow one, and is primarily an issue of fact. (Citations omitted.) The language most commonly used to describe the difference is that in order to be grounds for invalidating a release the mistake must relate to a past or present fact material to the contract and not to an opinion concerning future conditions as a result of present facts. Thus, the prognosis or probable path of recovery or complication is a matter of opinion respecting future events and, if mistaken, will not be grounds for rescission. Diagnosis, or analysis of injury in terms of nature and extent, on the other hand, is a question of present fact and, if mistaken, will be grounds for rescission." *Id.* 458 P.2d at 981.

I disagree with Justice Quinn to the extent that it sets forth a subjective test, governed by what the minor's father knew about the injury for setting aside the release. The rationale for the rule that a mistake in prognosis will not support invalidation of a release is clear. Public policy

favors the settlement of disputes without resort to the courts, provided such settlements are fairly reached. *Davis v. Flatiron, supra.* Valid releases must be assured a degree of finality. If the plaintiff in the instant case had not executed a release, and the case had gone to trial, the judgment rendered would have been final, and the doctrine of *res judicata* would have foreclosed a new action for damages. *Pomeroy v. Waitkus*, 183 Colo. 344, 517 P.2d 396 (1973). The dangers inherent in setting aside a release because an injured party did not foresee the medical complications which could be triggered at a later time, are well summarized by Chief Justice Hodges in his opinion. I agree with the views expressed by the Chief Justice relating to the release issue, but disagree as to his approval of the procedure followed by the trial court.

The trial court made a factual finding that traumatic epilepsy constituted an error in prognosis. On the basis that the mistake was in the prognosis, and not an error in diagnosis, a summary judgment was granted on the authority of *Davis v. Flatiron, supra.*

An action for traumatic epilepsy is barred by the release if the disease was the result of an error in prognosis. *Davis v. Flatiron, supra.* If the error was in diagnosis, the plaintiff's claim for relief should be reinstated. *Scotten v. Landers, supra.* The factual issue must be resolved by a jury.

Accordingly, I would reverse the trial court and remand for a trial on the factual issues which were resolved by the court without a jury in a hearing on the motion for summary judgment.

HODGES, Chief Justice, dissenting:

I respectfully dissent.

The majority opinion, as I read it, holds that the trial court erred procedurally by granting defendants' motion for summary judgment because there existed a genuine issue of fact which should have been submitted to a jury for determination. In my view, there was no genuine issue of fact remaining after the combined hearing on defendants' motion for summary judgment

and the plaintiff's motion to set aside the release. Therefore, the trial court, after denying the motion to set aside the release, properly granted the defendants' motion for summary judgment. It is clear from this record that these rulings were made after an extensive presentation of evidence by the plaintiff in support of her motion to set aside the release.

The majority correctly points out that the defendants' answer contained a demand for a jury trial, and that at no time after that demand was made did all of the parties agree to waive a jury. Consequently, if any issues of fact remained unresolved, they should have been decided by a jury, and not by the court. C.R.C.P. 38(d); *Forster v. Superior Court*, 175 Colo. 444, 488 P.2d 202 (1971).

In my view, however, there were no disputed issues of fact. All of the parties agree that Darlene Guzman (plaintiff), when she was a minor, was struck on the head on September 29, 1970, by a vending machine which fell from a truck being operated by Irwin D. Gleason in the course of his employment with Coin Fresh, Inc. (defendants). It is agreed that, as a result of that injury, she suffered an intratemporal lobe hematoma. On October 22, 1972, the Denver Probate Court approved a settlement agreement whereby plaintiff's father, Tranquillino Benavidez, as her legal guardian, received $6,114.35 in exchange for a general release of any claims against defendants.[1]

Finally, it is agreed that in May 1974, plaintiff experienced an epileptic seizure. The evidence before the trial court revealed that traumatic epilepsy may have resulted from the intratemporal lobe hematoma suffered by the plaintiff on September 29, 1970.

The majority, however, asserts that there is an issue of fact as to whether the October 1972 release should be set aside because if Benavidez had been advised or had known that traumatic epilepsy was a possible complication resulting from the plaintiff's injuries, he would not have signed the release. The evidence before the court reveals no mistake in diagnosis upon which a mutual mistake of fact could be based. There is no mistake of fact involved in this case, and therefore, as a matter of law, the trial court correctly ruled that the release barred the plaintiff's claim.

A release may be set aside where it was obtained as a result of a mutual mistake of fact based upon a mistake in diagnosis. *Scotten v. Landers*, 190 Colo. 27, 543 P.2d 64 (1975); *McCarthy v. Eddings*, 109 Colo. 526, 127 P.2d 883 (1942). Only a mistake in diagnosis, and not a mistake in prognosis, will warrant the setting aside of a release. *Davis v. Flatiron Materials Co.*, 182 Colo. 65, 511 P.2d 28 (1973); *McCarthy v. Eddings, supra*. Mistakes in diagnosis are mistakes of past or present physical condition, while mistakes of prognosis are mistakes with regard to the future course of recovery from a known disease or known injury. *Davis v. Flatiron Materials Co., supra*.

Although the majority recognizes the distinction between diagnosis and prognosis, its interpretation of the facts leads it to conclude that this case involves a mistaken diagnosis. In my view, if there was any mistake, it was a mistake in prognosis and will not support setting aside the release.

As a result of the injury to her head occasioned by the falling vending machine, the plaintiff sustained an intratemporal lobe hematoma. Several years later, she was stricken by epileptic seizures, which could have any number of causes, *see* 5 *Cyclopedia of Medicine, Surgery, Specialties*, 229 (1973), including an intratemporal lobe hematoma. *See 5 Cyclopedia of Medicine, Surgery, Specialties, supra; Gordy and*

---

1. The Probate Court's order stated:

"WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:
That the compromise settlement on behalf of said Minor . . . is hereby approved; and said Natural Guardian, Tranquillino Benavidez, is hereby authorized and directed to accept the sum of Six Thousand One Hundred Fourteen Dollars and Thirty-Five Cents ($6,114.35), in full and complete settlement of all claims of said Minor, Darlene Benavidez [Guzman], and said Guardian against Irwin D. Gleason, owner and driver of the automobile involved, and to deliver a full and complete release in the form attached to the petition.

*Gray, 3B Attorneys' Textbook of Medicine,* §§ 92.20, 92.40 and 92.52 (1963); *Cantor, 4 Traumatic Medicine and Surgery for the Attorney,* § 807 (1961).

Post-traumatic epilepsy is an occasional consequence of an intratemporal lobe hematoma. As such, it frequently does not become manifest for months or even years after the injury, if ever. *See Gordy and Gray, supra* at § 92.52; *Cantor, supra,* at § 807(1). In this case, it was nearly four years before the plaintiff suffered an epileptic seizure. Thus, at the time the release contract was entered into, any mistake with regard to the plaintiff's subsequent affliction with post-traumatic epilepsy was a mistake with regard to her future course of recovery from the intratemporal lobe hematoma, or prognosis. It was not a mistake of diagnosis. Mistakes in prognosis will not support the setting aside of a valid release contract. *Davis v. Flatiron Materials Co., supra; McCarthy v. Eddings, supra.*

The rationale for such a rule is clear. Public policy favors the settlement of disputes without resort to the courts, provided such settlements are fairly reached. *Davis v. Flatiron Materials Co., supra; Rogers v. Funkhouser,* 121 Colo. 13, 212 P.2d 497 (1949). For defendants in personal injury cases to be induced to enter into such settlement contracts, they must be assured of a degree of finality. *Davis v. Flatiron Material Co., supra.* If an injured party can set aside a release contract simply because he was not specifically aware of a consequence of his injury which subsequently developed, any incentive for a defendant to enter into such a release transaction would be nullified. The only safe release from a defendant's viewpoint would be one listing every possible consequence of the known injury.

As a practical matter, such an all-inclusive list is an impossibility.

The record reflects that the probate court was careful to make certain that Benavidez, as the plaintiff's guardian, was aware of the ramifications of entering into a general release.[2] Having chosen to settle the case for an agreed amount which in this case included a substantial percentage for possible future damages, the plaintiff must be held to that election.

There being no question of fact requiring determination, the record indicates that the trial court properly granted defendant's motion for summary judgment. The decision of the court of appeals should be reversed and the judgment of the trial court affirmed.

I am authorized to say that Justice ROVIRA concurs in the dissent.

2. Before approving the settlement agreement, the judge in the probate court questioned Benavidez with regard to his understanding of the significance of entering into such a release. During the court's questioning, the following exchange took place:

"THE COURT: Mr. Benavidez, do you understand that if this settlement is made it will be a full and complete and final settlement, and neither you nor your daughter would have any further claim against Irwin D. Gleason and his insurance company?

THE WITNESS: Yes, I understand that.
THE COURT: And do you understand that that is so, notwithstanding what the future of your child might be as a result of these injuries?
THE WITNESS: Yes, I understand that, too.
THE COURT: You know that you could not reopen this case?
THE WITNESS: I couldn't, yes."